At this time, we'll hear Fox News Network v. TVEyes. Good morning, Your Honors, and may it please the Court. My name is Kathleen Sullivan, and I represent TVEyes. TVEyes has created a comprehensive, searchable database for online research about television programming, all 27,000 hours per day from 1,400 radio and television stations. And in so doing, it has created the audio-visual analog to the Google Books, whose search function this Court found transformative in Authors Guild. Your Honor, there can't be any serious dispute. The analog is quite imperfect, isn't it, in the sense that your product distributes far more of the broadcast content than the snippets made available by Google. Your Honor, the question about Factor 3, the amount and substantiality of the use in relation to the transformative purpose, doesn't have a fixed algorithm. I understand that, but my question is directed at the attempt to draw an equation between what Google did and what your client does. Absolutely, Your Honor. I want to begin by drawing an equation as to the transformative purpose at Factor 1, and I think there we're on all fours. But going to Factor 3, where you've... I can follow you with respect to the index that you're on all fours. Both Google Books and here, there's the transmission of a complete database that's searchable, right? That's right, Your Honor. We're on all fours as to the reaction of the database. At this point, if we stop at the index, you have an analog to Google Books. I believe we... Yes, Your Honor. Okay. Now, but you began by saying, I'm not quoting you, but in effect, the whole system is analogous to Google Books. It is, Your Honor. It is. All right. Now, I want to go from the index to the next step, having, I think, agreed with you, the searchable database of the entire copyrighted material. Yes, Your Honor. All right. Now, as I understand it, TBI says to its customers, you can get, and I want a clarification here, at least the news story you want, or perhaps the news story beginning 14 seconds in, but you can get the news story you want. Your Honor, that's not quite right. Let me go back to... Okay. That's what I want to be clear about. So, here's why we're analogous to Google Books at both steps, the creation of the database, no question there. Fox doesn't challenge that, but as to the content delivery, the question is, do we allow our users access through the use of search terms to an amount of the broadcasting content that is reasonable in relation to the transformative purpose? Now, let's start with the transformative purpose extends not just to the index step. Transformative purpose also extends to the consumer use step, the subscriber use step. It's uncontroverted at the appendix at 254 to 55, and as found by Judge Hellerstein at SPA, at Special Appendix 20, there's no question that when our subscribers, which are businesses, government agencies, military, police, corporations, when they're using it, they are using it for research, commentary, and criticism when they download it. So, with respect, Your Honor, I think the only question to go back to Judge Kaplan is, is it too much? Are our snippets too big in relation to the transformative purpose? And they're not. Well, let's get the fact of quantity before we discuss its significance. Yes, Your Honor. I'd love to do that. Your papers put some emphasis on the fact that the downloaded news story begins 14 seconds in. That's not right, Your Honor. No? Can I explain? Yes, I wish you would. And this is all at the Special Appendix. Let me give you the admitted numbers. So we're on summary judgment in the 56.1 statement, Fox admitted to a set of facts about the way the news works. So let me summarize that for you. First of all, we make clips available beginning 14 seconds before the search term, just like Google. So not 14 seconds into the broadcast, Your Honor, 14 seconds before the term. Before the search term. You're right. That's right, Your Honor. It's important, because that means it's the same search as in Google. You take your search term, Syria, Nordstrom, the news. Some of the papers indicate that, in fact, the customer can get the entire story. That's absolutely incorrect, Your Honor. Incorrect. Absolutely incorrect. You're telling us that even on the date-time search, there is no way to get the whole story. That's exactly correct, Your Honor. And here's why. What's the support for that in the record? The support for that in the record is that the clips are available only for a maximum of 10 minutes. The clip, the maximum clip that is available, is available for 10 minutes. That's what we want. How many news stories last much longer than 10 minutes? Well, Your Honor, the viewing data... And nobody watches these clips for 10 minutes. Nobody. The record is absolutely undistinguishable. Does that matter? It does, Your Honor, because... Is that what they're capable of doing? It's not, Your Honor. What matters is, what is our business model, and is it a fair use? And we make 10 minutes available for a reason. It's broadcast television. It has commercials. People to get their minute of access, or their 10 seconds of access, may need to find the term in the teaser, skip through the commercials, and then see the story. Or they may need to... The basis for saying it doesn't matter what they can do, it only matters what they do. Your Honor, I believe that what matters is their fair use in our practices. And the... Their actual use or their permitted use? Your Honor, I believe that what the actual use by our customers is the best evidence of what fair use we are providing. I agree that... Well, isn't that... If you took the entire book, and stood here before that panel, and said, but our customers only look at the snippet, you think the case would have come out the same? Your Honor, Google Books is available to the entire world. We're more restrictive than Google Books in important ways, because... No, no, no. You're talking about the customer base. Yeah. Your Honor... My question didn't have anything to do with the customer base. It had to do with the distinction between actual use and permitted use. And your point was, we should focus on actual use. And so, I ask you, if Google Books had transmitted the entire book, but had data showing they only... The customers only look at the snippet, do you think the court case would have come out the same? Your Honor, it would have been a much closer case, obviously. Oh, it would have been overwhelmingly the other way around. Your Honor, let me... Let me say why... Not just close. Let me say why we're not that case. Could I just... Let me... You really think transmitting a whole book would be a close case? You don't believe that. Your Honor, Google Books is entirely different from us. It's accessible to the world. We're accessible... So, it's no longer the analog. So, Your Honor, it's... Look, the typical news broadcast, maybe not all of them, maybe not 100% of them, maybe not 60% of them, half an hour. And so, what your search term, search enables, is the downloading and so forth of a third. Not anything remotely like Google Books. And if the customer is interested, it takes two seconds to get the whole thing. And that puts aside what the customer gets if it says, let me see what Fox News broadcasts on March 6th between this hour and that hour, then they get the whole thing. Isn't that true? Your Honor, I appeal to the record. Let me... The record is undisputed as well. Let's get this out. It's important. You asked, are our snippets too big? 10 minutes is available and that you cannot have more than 25 minutes consecutively. And the evidence in the record is that nobody watches for 10 minutes. There is zero evidence in the record that anybody watches for 10 minutes. Three instances from 2003 to 2014, did anybody play two consecutive Fox News clips? And what case says that actual use is what counts rather than permitted use? Your Honor, I'm not claiming that as a legal matter. I'm claiming that the actual use is evidentiary of our business model. Well, whether it's a legal matter, whether it's fair use. So my question remains, what case says actual use determines fair use rather than permitted use? Your Honor, I'm not questioning that permitted use matters. I am suggesting to you that the actual use is highly probative of the model. Well, doesn't it touch... Do you want to hear how the model works? Does any case say that? I appreciate that's your argument. Is there any law that says actual use is not only relevant but decisive and permitted use is sort of a throwaway? Your Honor, this court in Authors Guild versus Google repeatedly referenced the use of snippets. The use of snippets. There's an entire discussion in Authors Guild about trying to use the snippets. The snippets were totally different. The snippets were what were available. Okay. Your Honor, I sense... How does your business model justify a 10-minute clip? Your Honor, because 10 minutes... Let's get the facts out first. It's undisputed on this record how people use it. And I'm suggesting... But doesn't that actually cut very much against you? If that really shows that nobody looks at more than a minute or two, how can you... Doesn't it undermine your argument that 10 minutes isn't too much? What you're really saying is that they're using it as an index. And you don't need 10 minutes. And to the extent you make 10 minutes available, there's not really a very strong argument that it's a fair use. Your Honor, there is an argument it's a fair use. 51% listened to these 19 works, which were all hour-long programs, for only 10 seconds. More than half listened or watched for only 10 seconds. 53 seconds is the average length of a view. And only in the entire platform, from two... The entire platform over the length of the record, 0.08%, that's one in 1,250 views, were 10 minutes long. All true. All true. But you haven't given me a case that says that matters. Authors Guild looked to the use of snippets as probative of whether there was a fair use. It looked to the experiment the plaintiffs conducted in reconstructing... Didn't permit more than the snippet. Your Honor, here's why we can't... Snippets should be assessed in relation to the transformative use. Your Honor, I'm going to need to go over to answer the question. I think we can anticipate that. Is that permissible, Your Honor? Go right ahead. Thank you, Your Honor. Let me try to explain why our snippets, which are audio-visual snippets, need to be allowed for 10... Or it's fair use to allow them for 10 minutes. And it's probative of fair use that they're actually only viewed by the subscribers half the time for 10 seconds or less. And viewing is important, not just the index function. And on average, they're viewed for 53 seconds or less. And here's why. Part of what TVEyes is about, and at this moment in our history, I think it's important to think about this. Part of what TVEyes is about is not just... It's not about watching television. It's about researching what happens on television. Who's covering what? What topics? For how long? It enables comparison between programs. It becomes important, for example, to know that one station had a lead seven minutes on a story, and another station had a lead half a minute on a story, because that shows you what kind of focus the two stations might have. So length of story matters. Which story appears after a commercial, or which commercial appears after a story is relevant? And you need a larger segment than just the index to find out that purpose. When you give the statistic that most viewings are 10 seconds or less, why wouldn't we simply assume that those are instances in which people, the end users, decided this is not responsive to my needs? You would, Your Honor. And that's why it's a fair use to make the 10... When it is responsive to the needs, you can watch for 10 minutes, or you can watch for two, three, four minutes. That's correct, Your Honor. And when you're dealing with news articles, I mean, we're dealing with Fox News. I mean, most news items don't last for more than three minutes. It's like searching... If I have a database of haiku, and you're only going to give three lines. I had the same thought, Your Honor, that Google's snippets cover haikus, but of course they take your poetry collections out of it. And they take out dictionary entries. It's true, Your Honor, but let's go back. The works... Fox was free to pick its most representative works. They picked 19 hour-long programs. You have the disks in your record. They picked hour-long programs. Now, I know if you're only... The 10 minutes is not there to be consumed. It's there to enable the search to be meaningful when you're looking for temporal facts, like how long were the different stories covered on different stations, which story was put after which commercial or before which commercial. These are all parts of the research use. So I think it's highly probative, Your Honor, that if we set it up that you can get 10 minutes but you never do, that's probative of it being used for research purposes. And these facts about clip duration are undisputed. It's extremely powerful that nobody watched for 10 minutes. Judge Kaplan, I agree it would be a problem if people watched for 10 minutes, potentially, but nobody does. Nobody uses it as a substitute for watching TV. If it's commercial television, nobody would watch for 10 minutes because they'd be jumping over the commercials. So, Your Honor, here's the key point. The question you need to ask under Authors Guild is, is the amount and substantiality of use excessive in relation to the transformative purpose? If you accept the transformative purpose is different here from in Google, Google, it's to find the book with the term. Here it is to analyze, research, criticize, comment on in a comparative way, the way that television covers stories. The question is, are you looking at something, are you asking whether it's excessive in relation to the transformative purpose of TVIs, or are you looking at it in terms of whether it's excessive in terms of the transformative purpose that the end user may ultimately make of it? Oath, Your Honor, because our business model is to enable the user, so I'm not shifting it to saying that the transformative use is from the user's perspective. I'm saying from TVIs' perspective, our business model is to enable users to perform the transformative functions of research, commentary, and criticism. Again, I'd refer you to Appendix 254 to 55, and Judge Hellerstein looked at that and he said, I accept, and it's undisputed, that the users are making transformative use. They're not just clipping, they're using it to analyze research. We add all kinds of statistical functions and heat maps that tell you where the stories have appeared nationwide. Let's go back to Google Books a second. Yes, Your Honor. Google Books said the index was transformative because it enabled a user to know if a search term was used and where it was used. And it said it gives him facts about the book. That's right, Your Honor. And snippets. And apparently in this case, there's no dispute that giving those facts about the news story, when it was used and where, is transformative, because that's not an issue, right? Knowing when and where it was used. That's correct, Your Honor. Okay. All right. Now, the dispute is about doing more than that. Yes, Your Honor. The dispute is about saying you also get to look at the video content of the story. That's right, Your Honor. All right. Now, I have no doubt that the customer wants to see that for all the reasons your brief gives. But what's transformative about seeing a whole story when he's already learned the facts about where it is? Your Honor, as this court said in the Swatch v. Bloomberg case, the tone of voice, the in that case, the analyst call, is as relevant, and this is the same thing that the district court found here, that the presentation, visual cues, and auditory cues about the programming can be as important to the public use here, the research, criticism, and commentary, etc. I don't doubt that it's useful to the viewer, just as if the person who got the snippet in Google Books would have liked to see the whole page. That would have been useful. Reading the whole book would have been useful. Why would it have been transformative if it didn't tell him anything that's transformative beyond knowing where it was? Your Honor, you can't possibly limit Google Books to the dead letter on the page without overruling Swatch. Swatch took the step of saying that hearing the analyst call, hearing the tone of voice, seeing the inflection on the screen, understanding demeanor, tone, voice, arched eyebrow, and so forth, that that's part of the content that is relevant to the user's transformative criticism, commentary, and analysis. Your view is the user needs to see and is entitled to see the entirety of the news story. No, Your Honor. We never, ever, ever, never, ever give them the entirety of the news story. Not ever. Not of the work as it's defined by Fox. Not ever. We give them 14... Chief Executive in the appendix, this is CA-445, he was asked, so TVIs can permit a user to download an entire news story, right? Answered. That is absolutely a capability. Oh, Your Honor, perhaps I misheard. If by news story, you mean the one-minute version of the story. I mean, we never allow the entirety of the work. By news story, I mean the story that conveyed the news of the search term. Your Honor, we can't possibly be debating whether the entirety of the story could possibly be a fair use, and not after Google Books, and not after HathiTrust, and not after Swatch. Swatch is the entire analyst call. What you're saying is he needs to see the whole story to get the nuance, the face, and all the rest. Your Honor, surely that's correct. I mean, in this case... Well, then why are you run away from it? It is the whole news story. So Your Honor, here's... If he gives a perfectly straightforward commentary, and in the last two seconds of it, he sneers, or he snarls, or he adulates, whatever he does, that's part of what you say the viewer's entitled to. Your Honor, I am saying that, and perhaps I should have begun by saying this case is the analog to Google Books meets Swatch. Look, you're also having a problem with me in light of Kirkwood, your focus on what the users do. I mean, here comes... I guess Kirkwood was the defendant, asserting a fair use defense, and he set up a system or a business model that permitted people buying advertising on those stations to verify whether their ads were running when the stations were claiming the ads were running. Total user focus. And I bought into the idea in the district court that that was transformative. This guy was offering a service that had nothing to do with the content, really, and it was useful. And you know what this court had to say about it. Your Honor, I found considerable merit in the district court opinion in that case. Well, that's very kind of you, but it didn't... But I also want to say why we're perfectly consistent with what the circuit did with that case. And the reason is the following. In Kirkwood, in Infinity Broadcasting, there was no creation of a comprehensive, automated database. That's the step that we take, a search term, searchable, comprehensive database. That's the step we took through our own efforts. The database simply records 27,000 hours a day of TV broadcasting. No, Your Honor. Nothing too transformative about that. I'm sorry, Your Honor, but with all respect, this is different from Kirkwood because we add a function that did not exist with that telephonic access to radio programming. And the function we add, and this is the transformative function according to Authors Guilt Against Google, is automated search term searchability functionality. That's what we've added. That wasn't present there. We created a new use that enables research. Doesn't a use in order to be transformative have to do something with respect to the content of the underlying work? Absolutely not, or Swatch would have come out the wrong way. Bloomberg didn't transform the earnings call, it broadcast on Swatch. It simply put it in verbatim, and it said that because there was a transformative purpose, it had a different meaning and message because of the different purpose. As the then Chief Judge, as now Chief Judge Castman wrote for the court in that opinion, he said Swatch was trying to say this is what we should think. Well, if the transformative purpose matters, then Kirkwood's wrongly decided. Well, the transformative purpose is extremely important, but we're transformative purpose plus transformative function. And what's transformative here is that we enable research, criticism, and commentary, the preamble quintessential fair uses, through the search term capability. And I think, Your Honor, what this really comes down to is we're in agreement about I think we should be in agreement about transformation here. Where we're in disagreement is about whether the snippets are too large. We have audiovisual snippets that could run as long as 10 minutes for perfectly good fair use reasons in order to check commercial lanes and check which lead story ran which length of time on different stations. Those are all perfectly legitimate fair uses for the 10 minutes. The fact that the users actually never watch for 10 minutes shows that our research function is working. It's probative of the fact that we really are a research service and not a substitute. So, Your Honor, I actually think transformative purpose is enough. That's Swatch. Maybe Infinity could have come out differently if it followed the Swatch reasoning. But we're not just transformative purpose. We're transformative purpose plus function at both steps, the indexing and the content delivery. I want to come back to your Chief Executive because I'm not sure I got your answer. Is he right in saying the entire news story can be downloaded? If you define news story as something of less than 10 minutes, then the answer is yes. If you define the news... I define it as what the word says. A news story... Yes, Your Honor. ...about the term the customer asked. He's running the XYZ company. Yes and no. You can only... The clip will start 14 seconds before the term. You cannot look up news story X. You look up term Syria and it will run back 14 seconds before that. So you may get the news story starting in the middle. He says the entire story. Is he wrong? Your Honor, I'm not disputing that in many cases you could get an entire story of less than 10 minutes. But the fact is that people go to the context surrounding the search term. And this does go to Google. Google said that the snippet function is transformative too. It didn't just say the index. Yes. Because you need the context. You need the context in which the term appears. In our case, we try to supply audiovisual context. And I think it's beyond dispute that the audiovisual aspect, the tone of voice, the demeanor are all relevant to the fair use purpose. If we agree that he's right, you can get the entire news story. Is there any case that says you get the entirety of the item of a copyrighted item that a customer wants without paying for it? Swatch. That's your case. Well, swatch is the entirety of the item. There wasn't a single moment of blackout in the swatch earnings calls for all 42 minutes. And you've said it was essential to the ruling in Google at the first step that copying the entirety of a copyrighted work may be relevant to transformative purpose. So I think the entirety issue with respect is a red herring. The real question is, even assuming that an entire story might be downloaded, can that still be a fair use when the amount and substantiality is irrelevant? Why doesn't the availability of the entire story, the news event, why isn't that a fair analog to a dictionary entry which is not available under Google? So if you were searching a dictionary for a given word, the odds are that a couple lines before and a couple lines after, you'd get the whole thing. And why isn't the whole news story analogous to a dictionary entry, which Google, I don't think it's been decided, but they wouldn't dare apparently, take the step of making of Funk and Wagnalls available? So, Your Honor, I think the news story is quite different because what you're looking at the news story for is not, you're not just viewing it for news and entertainment. The purpose is to make available to the 2,200 subscribers who are businesses the opportunity to watch the news story to see inflection, demeanor, coverage, all the things that come from the audio-visual cues, duration. Your Honor, I'm not sure all that helps because, as I remember Judge Ratchet's opinion in the Houdon first case, it was a very fact that the Houdon first routine was being rendered with the same rhythms, with the same tonalities, with the same words that kept it from being fair use or militated against its being fair use. Fair enough, Your Honor, but there was no transformative purpose there as the court found in the McCollum case. The comedic purpose of the entirety of the Houdon first skit was preserved. Here we have an undisputedly different purpose, research, analysis, criticism, commentary, as opposed to news and entertainment. So, Your Honor, I think it's different in that respect. Let me say why... May I come back to the date-time search? Yes, Your Honor. I don't have it in front of me, but I have a note of it, that your 56.1 statement in paragraph 39 said, this feature allows users to begin watching a video clip at a specific time on a specific television station rather than entering a search term. Is that true? It does, Your Honor. Okay. So, if I enter CBS News, 6.30pm, March 6th, how much of that program do I get on the date-time service? Ten minutes max and with no capacity to go to a consecutive clip. A 30-minute delay, a 30-second delay, and then when you get to the second clip, you're shut down after 25 minutes. What do you mean by 30-second delay? No one is allowed to put on a consecutive clip that begins less than 30 seconds later than the first clip. Ever? Ever. So, in other words, if I look at the first 10 minutes of it today and I come back a year from now and I want to see the second 10 minutes, I can't get it? That's right, Your Honor. And you're shut down in any event at 25 minutes. It's undisputed that nobody can go more than 25 minutes. I'm sorry. I thought the database is only available for 32 days to begin with. It is, Your Honor. So, you can't look for another year later. I'm sorry, Your Honor? An individual can archive. An individual can archive. You have to archive it within the 32 days. That's correct, Your Honor. So, did I miss here? You cannot look at the date-time search past 32 days. Hasn't your client marketed that service as live TV streaming? You know, Your Honor, there are some stray emails from one employee that stopped in 2011 that referred to a fact sheet that were against company policy. The employee was shut down. We actually have circuit breakers that prevent WINCS from being accessed more than X number of times per hour, per day, per 30-day period. That was after this litigation, right? Well, it did begin. But, Your Honor, what's before you is an injunction. We're on an injunction appeal. And so, the only issues for us really are forward-looking and to the extent that we have made changes in our business model. That's right, Your Honor. Can I ask you a question? Do you seek to confirm from your subscribers whether they have subscriptions to cable stations? Because if they have the subscription to, say, Fox News, on their basic cable or on their augmented cable, then presumably they can watch it whenever they want. And if you want to do time-shifting, they could do it. Then transformative use doesn't even get to be an issue. Your Honor, we make sure our subscribers are businesses for business use. I do not believe we interrogate them about their cable subscription. But let me say why Fox News' online streaming service for its cable subscribers is not a substitute, not remotely a substitute for our service. It's not... The online streaming service you can get as a cable customer lets you watch continuous cable, but it doesn't have an automated term search function and it doesn't archive video clips. It's undisputed in this case that Fox keeps previous video clips on its website, only up to 16% of its content. So A, it can't substitute for looking at a clip that happened within the past 32 days, and B, it doesn't have automated search term capability. So the market... We're not... I think Judge Hallerstein is indisputably correct when he says they put on no evidence of market harm to their TV watching or cable subscription function. He said their arguments on that score are purely speculative. If what is going on here is not fair use, then I would think that the next step for your client would be either to ascertain that the subscribers have subscriptions  that provide a block of stations, or to arrange with the providers or the copyright holders that you'll pay them a dime every time somebody downloads a 10-minute segment. Your Honor, there's no question that... There's really no question about our contractual right to download this content. So I think the question you ask is, is there fair use? There's no question about your ability to download it or anybody else's. I mean, you can just record it. Your Honor, let me... We're now on... I think this case does come down to factor 3 and factor 4. We've come to factor... We've talked about factor 3. You're now turning to market harm, and there's no evidence that we harm their cable subscription business. That's really the question. The question is that we are not providing a substitute for watching TV. It was our burden, Your Honor, but they came forward... We said there's no evidence of our market harm, and they didn't rebut it in any way. There's zero evidence. Let's talk about the three kinds of market harm they claim. Television watching, 2,200 subscribers watching half the time for less than 10 seconds. There's no evidence of market harm. There's no conceivable evidence of market harm from that. And there is no evidence, by the way, that there was ever a consecutive download of two 10-minute segments in any but three instances for Fox content over 12 years. So this is not being used as a substitute for TV. The overwhelming undisputed evidence in the record says it's not being used as a substitute for watching TV. And so then the question is, are we hurting their derivative licensing market? And there is no derivative... They have no derivative licensing market for clips for research purposes. They have a teeny-tiny, $200,000-a-year licensing market for broadcast-quality clips, all of which, in the record, were prior to 32 days previous. ...potential non-speculative licensing market. Once a customer finds his company has been mentioned in the broadcast, in the newscast, and he wants to see all the other things you tell us about, the nuance, the subtlety, he can call up Fox. I assume, I'm gonna ask them, but I'm gonna assume it for the moment. He can call up Fox and say, you mentioned our company yesterday on your 4 o'clock newscast at 4.03, to be exact, and we'd like to buy a video of that tape. Surely they'll sell it to them, won't they? Well, uh, yes, they'll sell it to them with restrictions. All right, so if they will, then isn't that the cost of that tape what they're not getting because of TV audits? Your Honor, there's no evidence that anybody, any license would ever have been issued by Fox through its agents, but for TV ads. No evidence. There's three instances in the record, Your Honor. They're in the record at 187 and 193. There's three instances in the record where self-serving executive emails say, oh, we think we lost somebody because of TV ads. Two of them were in England, which doesn't have fair use. It doesn't have a First Amendment either. Why would a TV ads customer now do it when they've already paid you 500 a month to get that? The question, I think, is not, is not what the record shows they've done it, but whether you've got somebody who went to Fox News and said, we want to buy that clip, either on a per-program license or a blanket license, and Fox said, we don't do that. So, Your Honor... It's not worth our time. We don't, we just don't do that. Your Honor, what Fox does is licenses high-quality broadcast material with a set of contractual limitations, including that you can't criticize Fox. Right, because you're out there giving your customers... Not true, Your Honor. ...what they want. That's not, Your Honor, there is no evidence, none in the record, none, that Fox licenses for research purposes. It licenses for public performance in rebroadcasts. I agree with you. They don't do it because your customers now have your service. Your Honor, there's no evidence that our customers use our service for clips that are substitutes for Fox's market. To go back to American Geophysical against Texaco, in which there were excellent opinions by both the majority and the dissent. In that case, though, the majority and dissent agreed that what matters is not a speculative potential licensing market. What matters is, is there a reasonable and traditional licensing market or one in which there's been a proof that somebody's trying to develop a market? Fox has never tried to develop a market that was akin to the CCC market at issue in Texaco. Do you doubt that Fox would decline to chart, to honor a record, to deliver a news story to one of your customers, if we reverse, who says, I still want that, and they go to Fox and they ask for it and they offer money. Do you think, do you doubt they'd sell it to them? That Fox would sell it? Your Honor, Fox does sell news stories to its agents in a tiny market for $200,000 a year for high-quality rebroadcast purposes. It's undisputed that our clips are not good quality. They're like the thumbnails in the Ninth Circuit cases. I'm talking about one of your customers. If we say you can't do what you're doing... They wouldn't go to Fox. Fox would not get it. There's no proof that any of our customers would go to Fox. No, I understand there's no proof of it because it hasn't happened yet. Do you doubt that Fox would sell it to them? For $5,000 with a restriction that you can't... They're going to charge $5,000? That's what Fox charges. For a clip? For a clip. One minute? Yes. They charge $5,000 and when you sign the contract you can look for yourself and the record at A720 and A1757. They say, by the way, you can't use this to criticize Fox. And that takes us right to Campbell v. Acuff where the court said in fair use we don't say that you need to prove that you tried to get a license because why should anyone why should Roy Orbison agree to license a parody of Pretty Woman to two live crew? The reason we have fair use is so that you don't have to go seek a license from someone who wants to stop you from getting it. And the fair use here what our argument is simply yes, Your Honor, we do bear the burden and we did show that there was a complete absence of market harm because we are not a substitute for high quality polished broadcast quality clips for five thousand dollars a pop. We use ten to fifty second clips for our subscribers to analyze the news to decide who is telling what to the American people on broadcast to compare Fox News to other stations. The end users are doing what it is you say constitutes research. I mean, I can see that's a useful function. But your you also allow them to store it not just to watch it and report it also to store it and to send it on to others. And the reason for that is connected to the research use and let me say why. E-mailing is important so that you can run something up the military chain of command if you find out something important to military security so that you can run something up the chain of command in the police station to make sure that people know the correct thing about an amber alert. It's so that a journalist can share something with the editor. The e-mailing function is part and parcel of the collaborative activity of research analysis criticism and commentary that we enable. Can't be any doubt about that. Only question is whether it would be abused and there's no evidence in the record that there's market harm from e-mailing. If a link gets posted a link we don't send the copy we send a link and Fox doesn't even own exclusive rights to a link and if a link goes up on social media it's undisputed we shut it down and we terminate people if they've acted against their terms of service. We terminated the National Review for posting things on the internet. So e-mail is clearly connected to the research use and you're storing it. After 32 days as the district court so poignantly put it if TV disappears into the abyss from the face of the earth we can't perform the function of analyzing TV news programming that this was meant to perform. So by being able to archive it or I would suggest download to your own computer. The district court distinguished them. We think they're the same. You have to download so that you can access it if you're on a flight with no Wi-Fi or the military which doesn't allow its service members to be connected to the internet at all times can access it. This question about your customers packages. On this record do we have any information what percent of your customers  to cable packages that include these two networks? We don't have that in the record, Your Honor. Do you happen to know it offhand as an approximation? I don't know that, Your Honor. If you can look in the record at 253-54 and see the list of our subscribers, it's the White House, it's political parties, it's journalistic enterprises, it's military branches. It's a fair inference to believe. The White House has a big package of TV stations. I do, Your Honor. I'm saying I don't have that statistic in the record. I think it's a fair inference from the undisputed list that Appendix 253-54 that the entities listed there are highly likely to have cable subscribers. Let me turn it around the other way. Can you think of any reason why TVIs would not put into their contract a requirement that its customers subscribe to a cable package that includes these two networks? Your Honor, there's no reason not to, but fair use doesn't require it because the question is have we made... But it might in the judgment of some people affect whether it is fair use because if they subscribe, then they're paying indirectly to Fox, to the copyright owner, whereas without the subscription they're not. So, Your Honor, let me... You've been very indulgent with the time. With respect, I don't think that the requirement that the customer paid is important to the analysis unless we think we're siphoning off business from Fox. And there's no proof... If you agree with me that the record has no evidence that we're substituting for television watching, then we can't be siphoning off cable business from Fox. It seems to me essentially self-evident that the availability of your service in its present form is likely to have a meaningful or significant effect, quote, quoting the statute, upon the potential market for or value of the service. Maybe if Judge Newman's suggestion were a part of it, maybe if it wasn't 30 seconds, excuse me, 10 minutes or whatever the number is, maybe if it was a smaller snippet, maybe a lot of things, the case for fair use would be stronger. And it's not for us to design the business model for your client. Fair enough, Your Honor. Two answers. One, just to go back to American Geophysical against Texaco, this Court has repeatedly made clear that the inquiry is not into a potential market in a speculative sense. It has to be a traditional market or a market for which there's some empirical evidence that it would otherwise exist, and there's no evidence on this record, none, that there was a market that Fox would have profited from for the kind of clips that we make available. There just isn't. Second, Your Honor, it seems self-evident that no one is going to pay $500 a month for TVI's access as a substitute for their TiVo at home or their watching television at home because even at the exorbitant prices we have to pay the cable companies, a cable subscription is a lot lower than that. Yeah, but surely the one point is that if your end user subscribes to a package that includes say 1,400 stations hypothetically, then they already have paid for access to all these stations and all you're doing is manipulating what it is they have a right to look at and fair use would allow you to provide them the whole thing. Your Honor, I couldn't disagree more. We are not a giant clipping service for 1,400 stations. We are not infinity broadcasting and the reason is we, through our labor and ingenuity, have created as did Google Books an automated searchable comprehensive database and it can't be disputed as the district court found that we solve a market failure problem. Nobody could individually contract with all 1,400 stations find me the show on Syria that ran at the top of the hour. It couldn't happen. CDI solves a market failure problem and that's the fair use. We are not similar to a giant audio visual form of infinity broadcasting because we add the search function. You have passed that point in HathiTrust and Google. We can't go back. That's transformative and I think the only question is are our snippets too big and I have tried to explain to you and I want to be very clear. I'm not saying that we are off the hook on having to prove that we are making only a fair use. What I'm saying is the fact that our customers actually watch only for 10 seconds half the time and watch for an average of 52.3 seconds, that's the best evidence that it is our research function that is working. People are using it. You've several times referred to how expensive this service is but it's hard to see conceptually why it gets to be fair use if you charge a lot of money and the same thing is not fair use if you cut the copyright and the world might have shut down. Let me put it this way. The idea that 2200 business subscribers who provably use the service only for 10 to 50 seconds of targeted research for indisputably fair use purposes analysis research criticism commentary the idea this is a substitute for television watching at least twice the cost of your cable subscription not remotely plausible. This is not the case to say this is not a fair use. I welcome anyone else to come forward. They had discovery. They picked their 19 works. They couldn't come forth with any evidence of market harm to their subscription base to their website traffic or to their licensing market. Is it true your customer gets to see the entirety of what it wants to see? Our customer can see the following. One clip beginning 14 seconds before a search term. So it can see one clip up to 10 minutes from 14 seconds before a search term. And it can't see another consecutive clip that takes you past 25 minutes. Your adversary says at page 63 of their brief there are multiple instances. Incorrect. There are three instances between 2003 and 2014. Three instances of anyone watching any Fox program. The CEO said the entirety of the news story. Well, Your Honor, I think what we agreed before is that as Judge Jacobs pointed out a news story might be less than 10 minutes. What I'm saying is that there is no evidence in the record as to Fox content, Judge Kaplan, that any more than three views from 2003 to 2014 involved two consecutive  I'm very troubled. This was presumably in a deposition, the part I just read to you? It was in a declaration, Your Honor. It was in a declaration. It was in a  It was in a deposition, I'm sorry, Your Honor. It was in a deposition, Your Honor. When the head of the company, this is not just 14 lines down, he says, you get the whole thing. If there's a qualification to that answer, I'm very surprised it doesn't  Your Honor, I'm not disagreeing with you with respect to what he said. I'm disagreeing with you with respect to its  significance. If we define a news story as a minute, Yes, Your Honor, I'm not disagreeing with you about that. And that's what the customer wants, to see the news story. The customer can't just, let me, with this qualification, Your Honor, all the customer can do is look for the search term. The search and the clip automatically begins 14 seconds before the term. That may or may not get you the whole story. You may have to try to get   story out of your head. That's why we're not a substitute for Fox. I'm hopeful that we're to decide this case not on what the head of the company said could be done, but what counsel says in argument on appeal. That seems an odd way to decide the case. Your Honor, take the CEO of the company and take him at his word and we should still win on fair use because the issue is not the entirety of the news story. The issue is whether seeing the entirety of the news story, even if you could do it, and put aside all my qualifications and lawyer talk, put it aside, even if a clever user could get the whole story, because you'd figure I'll say Syria and I'll get 14 seconds before Syria and I'll say Benghazi and I'll get the entirety of the news story. That's not too much in relation to the fair use purpose, which is to research, analyze, criticize and comment on the news. And what I tried to do, Your Honor, in saying what the customers actually do, they actually watch half the time for 10 seconds or less, on average for 52 seconds. That's probative that they're using it for research. I know you could have said to me, yeah, yeah, they're saying for research, but the fact of the undisputed statistical evidence here is probative of the fact that it really is for research because they get in and out for the data.  this is          the case I'm talking about, the case I'm talking about is the case of the New York Times and       New York Times and the case I'm talking about is the case I'm the case I'm talking   the case I'm talking that I'm talking about is the case I'm talking about is the case I'm talking about is the case I'm talking about    I'm talking about case I'm talking about  case I'm talking about about the  I'm talking about the case  talking about the case talking about the  I'm talking about   I'm talking about the